[3.2013 prospective cell site/GPS warrant]
NMA:NS
F.#2013R00786

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**13 MISC 737**

- - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION
OF THE UNITED STATES OF AMERICA
FOR ORDERS AUTHORIZING THE
DISCLOSURE OF LOCATION DATA
RELATING TO A SPECIFIED WIRELESS
TELEPHONE

- - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

<u>FILED UNDER SEAL</u>

<u>AFFIDAVIT IN SUPPORT OF
APPLICATION</u>
(Fed. R. Crim. P. 41; T. 18,
U.S.C., §§ 2703(c)(1)(A),
3103a and 3117; T. 28,
U.S.C., § 1651(a))

I, SEAN OLSEWSKI, being first duly sworn, hereby depose
and state as follows:

1.    I make this affidavit in support of an
application for a search warrant under Federal Rule of Criminal
Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about
the location of the cellular telephone assigned call number (571)
337-7018, subscribed to by REDINEL DERVISHAJ with an address of
"Dummy, Dummy, No City, New York 11102" (the "SUBJECT
TELEPHONE"), whose wireless telephone service provider is T-
Mobile (the "Service Provider").  The SUBJECT TELEPHONE is
described herein and in Attachment A, and the location
information to be seized is described herein and in Attachment B.

2.    I have been a Special Agent with the Federal
Bureau of Investigation ("FBI") for approximately ten years.  I
am responsible for conducting and assisting in investigations
into the activities of individuals and criminal groups

responsible for racketeering activities including armed
robberies, extortion, loansharking and other violent crimes, and
other illegal activities.  These investigations are conducted
both in an undercover and overt capacity.  I have participated in
investigations involving search warrants and arrest warrants.  As
a result of my training and experience, I am familiar with the
techniques and methods of operation used by individuals involved
in criminal activity to conceal their activities from detection
by law enforcement authorities.

      3.     The facts in this affidavit come from my
personal observations, my training and experience, and
information obtained from other agents and witnesses.  Because
the purpose of this affidavit is limited to demonstrating
probable cause for the requested warrant, it does not set forth
all of my knowledge about this matter.  In addition, when I rely
on statements made by others, such statements are set forth only
in part and in substance unless otherwise indicated.

      4.     Based on the facts set forth in this affidavit,
there is probable cause to believe that extortion and conspiracy
to commit extortion, in violation of 18 U.S.C. § 1951, have been
committed, and are being committed, by REDINEL DERVISHAJ, BESNIK
LLAKATURA, DENIS NIKOLLA and others known and unknown.  There is
also probable cause to believe that REDINEL DERVISHAJ has used,
and is currently using, the SUBJECT TELEPHONE to engage in and

facilitate extortion and conspiracy to commit extortion.  There is therefore probable cause to believe that the location information, including but not limited to E-911 Phase II data (or other precise location information) concerning the SUBJECT TELEPHONE (the "REQUESTED INFORMATION"),[1] as described in Attachment B, will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses, as well as victims of these offenses.

## PROBABLE CAUSE

5.      Since approximately May 2013, the FBI has been investigating an extortion conspiracy involving REDINEL DERVISHAJ, BESNIK LLAKATURA and DENIS NIKOLLA, following receipt of information from John Doe #1, a victim of the extortion conspiracy who reported extortionate threats he received to law enforcement, whose identity is known to your affiant.  John Doe #1 owns a pizzeria in Little Neck, New York (hereinafter, the

---

[1] Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the SUBJECT TELEPHONE at the start and end of any call or text message transmission.  In requesting cell site information, the government does not concede that such cell site records — routinely retained by wireless carriers as business records — may only be obtained via a warrant issued on probable cause.  See In re Application, 632 F. Supp. 2d 202 (E.D.N.Y. 2008) (authorizing prospective acquisition of cell-site records under combined authority of 18 U.S.C. 2703(d) & 3121 et seq.); In re Application, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (same).

"Queens Pizzeria") and a seafood restaurant in Astoria, New York (hereinafter, the "Astoria Restaurant"). John Doe #1 has advised the following, in substance and in part:

a.    John Doe #1 has owned the Queens Pizzeria for approximately two years and opened the Astoria Restaurant in or about May 2013.

b.    The Astoria Restaurant uses and sells food items and products that were transported from, and/or manufactured, outside the state of New York.

c.    On or about the afternoon of May 11, 2013, an employee of the Queens Pizzeria informed John Doe #1 that a man had entered the Queens Pizzeria and asked to speak with John Doe #1. John Doe #1 subsequently entered the dining area of the Queens Pizzeria and spoke with the man, an Albanian male, who introduced himself as "REDINEL DERVISHAJ." During their conversation, DERVISHAJ stated that (1) John Doe #1 would have to pay DERVISHAJ $4,000 per month because John Doe #1 had recently opened the Astoria Restaurant in "our neighborhood;" (2) if John Doe #1 did not know who DERVISHAJ was, John Doe #1 should look DERVISHAJ up on the Internet;[2] (3) DERVISHAJ knew that John Doe

---

[2]    A "Google" search for "Redinel Dervishaj" results in articles from various media outlets showing photographs of DERVISHAJ and revealing the following information regarding DERVISHAJ's involvement in a fatal stabbing: According to the news articles, in or about March 2012, DERVISHAJ was arrested for stabbing Antonio Lacertosa with a butcher knife on Staten Island, New York, during Lacertosa's engagement party. Lacertosa died

#1 had a brother who owned a liquor store in Massachusetts who "had lots of money;" and (4) DERVISHAJ was going to send two men to the Astoria Restaurant that evening and John Doe #1 needed "to take care of them."

        d.    Following this encounter, on or about May 11, 2013, John Doe #1 called  (347) 392-0246, a telephone issued by Sprint and subscribed to by BESNIK LLAKATURA (hereinafter, the "LLAKATURA Cell Phone"), and spoke with his friend, BESNIK LLAKATURA, a New York City Police Department ("NYPD") officer of Albanian descent.  LLAKATURA advised John Doe #1 that DERVISHAJ and others extort various Albanian establishments in Astoria and that John Doe #1 opened the Astoria Restaurant in "their neighborhood."

        e.    John Doe #1 has known BESNIK LLAKATURA for many years and previously lived with LLAKATURA.  As a result, LLAKATURA knows personal details regarding John Doe #1, including John Doe #1's mobile telephone number and the fact that John Doe #1's brother-in-law lives in Massachusetts and owns a liquor store there.

        f.    On or about the evening of May 11, 2013, an employee of the Astoria Restaurant informed John Doe #1 that two

---

from his injuries.  In or about April 2012, a Staten Island grand jury declined to indict DERVISHAJ for Lacertosa's murder, after viewing video surveillance footage of events leading up to the stabbing, which DERVISHAJ's counsel argued showed DERVISHAJ acted in self-defense.

men came to the Astoria Restaurant looking for John Doe #1 when John Doe #1 was not there.  Thereafter, at approximately 10:41 p.m., John Doe #1 received a call on his mobile telephone from a telephone number with area code 718 (hereinafter, "718 Telephone Number 1").[3]  According to John Doe #1, the person who called him from 718 Telephone Number 1 identified himself as "Redinel" and, in Albanian, reiterated that John Doe #1 had opened his restaurant in "our neighborhood" and, as a result, John Doe #1 would have to pay "us."

        g.    Prior to May 11, 2013, John Doe #1 had never met REDINEL DERVISHAJ.  At no point during their May 11, 2013 encounter did John Doe #1 provide DERVISHAJ with his mobile telephone number.

        6.    Video surveillance footage captured by security cameras installed within the Queens Pizzeria corroborates John Doe #1's account of what transpired on the afternoon of May 11, 2013.  The video surveillance footage shows a man entering the Queens Pizzeria at approximately 3:47 p.m.[4] and speaking with an employee behind the pizza counter.  The employee then walks away.

---

    [3]    Records checks reveal that 718 Telephone Number 1 belongs to a pay phone located in Astoria, New York.

    [4]    Analysis of the video surveillance footage from the Queens Pizzeria indicates that the time-stamp from the footage is an hour behind the actual time (i.e., when the video footage indicates that it is 2:47 p.m., it is actually 3:47 p.m.).  The times set forth in paragraphs 14 and 20 reflect the actual time.

Approximately 25 seconds later, John Doe #1 enters the dining area from the back of the Queens Pizzeria and speaks with the man who had entered.   John Doe #1 and the man sit together at a table in the Queens Pizzeria for a short time, after which the man exits the Queens Pizzeria.   Telephone records also confirm that John Doe #1 called the LLAKATURA Cell Phone at approximately 3:53 p.m. on May 11, 2013.

7.      On or about March 23, 2013, DERVISHAJ was arrested in Queens, New York on a domestic violence charge. According to the NYPD Domestic Incident Report, DERVISHAJ's phone number is the SUBJECT TELEPHONE.   As noted above, the SUBJECT TELEPHONE is also subscribed to by REDINAL DERVISHAJ.   Telephone records reveal that the LLAKATURA Cell Phone was used to call the SUBJECT TELEPHONE at approximately 3:13 p.m. on May 11, 2013 – approximately 34 minutes before DERVISHAJ visited the Queens Pizzeria on May 11, 2013 and approximately 40 minutes before John Doe #1 called LLAKATURA to inform him of the extortion threats made by DERVISHAJ.   Telephone records also reveal that the SUBJECT TELEPHONE was used to call the LLAKATURA Cell Phone on May 11, 2013, after DERVISHAJ's visit to the Queens Pizzeria, at the following approximate times: 3:49 p.m., 5:58 p.m., 6:08 p.m., and 10:47 p.m..   Based on the timing of the above-described calls, the information conveyed by DERVISHAJ to John Doe #1, and my training, experience and participation in the investigation, I

7

believe that LLAKATURA probably knew of DERVISHAJ's plan to

extort John Doe #1 prior to being informed by John Doe #1 of

DERVISHAJ's threats and, further, that LLAKATURA probably aided

the extortion plan by providing DERVISHAJ with (1) personal

information regarding John Doe #1's brother-in-law, which

DERVISHAJ conveyed to John Doe #1 during the May 11, 2013

meeting; and/or (2) John Doe #1's mobile telephone number, which

DERVISHAJ used to call John Doe #1 from 718 Telephone Number 1 on

the evening of May 11, 2013.  Based on my participation in the

investigation, and my training and experience, I further believe

that DERVISHAJ called LLAKATURA immediately following his May 11,

2013 meeting with John Doe #1 and immediately following his 10:43

p.m. phone call to John Doe #1 to, inter alia, convey to

LLAKATURA what transpired during the meeting and phone call,

respectively.

      8.     According to John Doe #1, on or about the

evening of May 12, 2013, John Doe #1 closed the Queens Pizzeria,

got into his vehicle and began driving home.  As John Doe #1 was

driving, he noticed a white Chevy Malibu sedan (hereinafter, the

"Chevy Malibu") following his vehicle.  Thereafter, John Doe #1

observed DERVISHAJ get out of the Chevy Malibu, knock on the

front driver's side window of John Doe #1's vehicle and state the

following, in Albanian, in substance and in part: "What happened?

You think you're a tough guy?  You think you have balls of steel?

I want $4,000 for the restaurant per month." DERVISHAJ further stated that John Doe #1's restaurant was going to be a "gold mine" and that John Doe #1 had to pay "us." John Doe #1 reported the license plate number of the Chevy Malibu to law enforcement personnel. Records checks reveal that the Chevy Malibu is registered to DERVISHAJ at an address in Queens, New York. Telephone records reveal that (1) the SUBJECT TELEPHONE was used to call the LLAKATURA Cell Phone at approximately 1:56 p.m. and 5:20 p.m. on May 12, 2013; and (2) the LLAKATURA Cell Phone was used to call the SUBJECT TELEPHONE at approximately 8:29 p.m. on May 12, 2013.

9.     According to John Doe #1, on or about May 14, 2013, at approximately 8:30 p.m., John Doe #1 noticed the Chevy Malibu on the streets of Astoria, Queens. At approximately 10:30 p.m., John Doe #1 saw DERVISHAJ park the Chevy Malibu across the street from the Astoria Restaurant and walk towards the Astoria Restaurant. Thereafter, DERVISHAJ again demanded money from John Doe #1. John Doe #1 told DERVISHAJ that he was not making any money from the Astoria Restaurant, as he had not yet received his liquor license. DERVISHAJ nonetheless continued to demand payment, telling John Doe #1, in substance and in part, "you have to take care of us." Telephone records reveal that the SUBJECT TELEPHONE was used to call the LLAKATURA Cell Phone at approximately 8:04 p.m., 8:22 p.m., and 11:02 p.m. on May 14,

2013. Based on my training and experience, and the timing of these calls, I believe that DERVISHAJ called LLAKATURA to discuss the extortion of John Doe #1.

10. Telephone records further reveal that between May 17, 2013 and July 3, 2013, the SUBJECT TELEPHONE and the LLAKATURA Cell Phone were in contact approximately 29 times.

11. Following the receipt of information from John Doe #1 regarding the extortionate threats he received in May 2013, law enforcement agents took various investigative steps, including setting up pole cameras outside the Queens Pizzeria and the Astoria Restaurant, obtaining telephone records, conducting records checks, and attempting to locate video surveillance footage to corroborate the information received from John Doe #1. John Doe #1 has advised that he did not receive extortionate threats following the May 14, 2013 incident described above until in or about July 2013. More specifically, John Doe #1 has advised the following, in substance and in part:

a. On or about the evening of July 6, 2013, John Doe #1 closed up the Queens Pizzeria. As John Doe #1 exited the Queens Pizzeria and proceeded towards his vehicle, which was parked in a driveway behind the Queens Pizzeria, John Doe #1 noticed a black Dodge Charger vehicle (hereinafter, the "Dodge Charger") also parked on a side street behind the Queens Pizzeria.

10

b.   John Doe #1 pulled out of the driveway and turned left onto the street, at which point he noticed at least three men inside the Dodge Charger.  Thereafter, the Dodge Charger began following John Doe #1's vehicle.  John Doe #1 noticed that the Dodge Charger did not have a front license plate.

c.   John Doe #1, who was driving on a narrow residential street, subsequently attempted to make a U-turn in an effort to see the Dodge Charger's rear license plate.  As John Doe #1 did so, his vehicle ended up nose-to-nose with the Dodge Charger, at which point John Doe #1 reversed his vehicle for approximately half a block and attempted to turn his vehicle around.  John Doe #1 was unable to turn his vehicle around, however, as his vehicle was too close to a street pole on the corner.  At this point, the driver of the Dodge Charger exited the Dodge Charger carrying a gun, ran towards John Doe #1's vehicle, and pointed his gun at John Doe #1, while yelling at John Doe #1.  John Doe #1 managed to escape the area and drove away.

d.   John Doe #1 has identified a photograph of DENIS NIKOLLA as the driver of the Dodge Charger who pointed a gun at John Doe #1 on July 6, 2013.

12.   Video surveillance footage in and around the Queens Pizzeria shows that John Doe #1 closed the Queens Pizzeria

11

on July 6, 2013 at approximately 11:27 p.m..  Video surveillance
footage also shows that a black Dodge Charger drove by the Queens
Pizzeria at approximately 9:47 p.m., and was outside the front
entrance of the Queens Pizzeria from approximately 10:00 p.m. to
10:10 p.m..  Within the next hour, the video surveillance footage
further shows a black Dodge Charger drive by the Queens Pizzeria
several times onto a side street.  The black Dodge Charger
captured by the video surveillance footage had no front license
plate.

       13.    Records checks reveal that a black Dodge
Charger is registered to DENIS NIKOLLA in Florida.  A check of
the NYPD's Real-Time Crime Center License Plate Reader database
indicates that the Dodge Charger registered to NIKOLLA has been
captured on license plate reader cameras in New York City
multiple times in July 2013.

       14.    According to John Doe #1, shortly after the
above-described incident with the Dodge Charger, at approximately
12:23 a.m. on July 7, 2013, John Doe #1 received a phone call on
his mobile telephone from DERVISHAJ, using a telephone number
beginning with area code 718 (hereinafter, "718 Telephone Number
2").[5]  According to John Doe #1, DERVISHAJ informed John Doe #1,
in Albanian and in substance and in part, that DERVISHAJ had not

---

     [5]    Telephone records reveal that 718 Telephone Number 2
belongs to a pay phone located in Astoria, New York, located
approximately 0.6 miles from the Astoria Restaurant.

forgotten about John Doe #1, that he knew what was going on and that John Doe #1 "got lucky this time."  Based on my participation in the investigation, and my training and experience, I believe that DERVISHAJ's statement that John Doe #1 "got lucky this time" was a reference to John Doe #1 having been able to escape unharmed, despite NIKOLLA's having pointed a gun at him.

15.    Telephone records indicate that (516) 423-3813 is a mobile telephone issued by Sprint and subscribed to by DENIS NIKOLLA at 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213 (hereinafter, the "NIKOLLA Cell Phone").  Telephone records further show that on July 6, 2013 – the date that NIKOLLA displayed a gun to John Doe #1 – the NIKOLLA Cell Phone was in contact with the SUBJECT TELEPHONE leading up to the gun incident at the following approximate times: 2:49 p.m., 2:50 p.m., 3:04 p.m., 6:24 p.m., 6:57 p.m., 7:31 p.m., and 8:36 p.m..  Telephone records also show that the NIKOLLA Cell Phone was in contact with the SUBJECT TELEPHONE following DERVISHAJ's 12:23 a.m. call with John Doe #1 on July 7, 2013 at the following approximate times: 3:56 a.m., 7:55 p.m., 8:04 p.m., 8:25 p.m., 8:35 p.m., and 10:43 p.m..  Based on the timing of these calls, my participation in the investigation, and my training and experience, I believe these calls related to the gun incident.

16.     At approximately 6:33 p.m. on July 7, 2013,
LLAKATURA sent John Doe #1 a text message from the LLAKATURA Cell
Phone, which stated "U are in deep shit u know.  I dont want ur
problems to become mine," which law enforcement agents have
viewed on John Doe #1's mobile telephone and which telephone
records confirm was sent from the LLAKATURA Cell Phone.
Telephone records further reveal that (1) the SUBJECT TELEPHONE
was used to call the LLAKATURA Cell Phone at approximately 1:32
p.m., 3:12 p.m., 4:44 p.m., 4:51 p.m., 8:26 p.m., 9:05 p.m., and
10:01 p.m. on July 7, 2013; and (2) the LLAKATURA Cell Phone was
used to call the SUBJECT TELEPHONE at approximately 9:49 p.m. on
July 7, 2013.  Based on the timing of the above-described phone
calls from DERVISHAJ to LLAKATURA, which preceded LLAKATURA's
text message to John Doe #1, and my training and experience, I
believe that DERVISHAJ informed LLAKATURA John Doe #1 had been
threatened with a gun and that this incident was the "deep shit"
LLAKATURA was referring to in his text message to John Doe #1.

17.     On or about July 8, 2013, at approximately 9:46
p.m.,[6] John Doe #1 called LLAKATURA on the LLAKATURA Cell Phone,

---

[6]     In a prior affidavit in support of an application for
orders authorizing the disclosure of location data relating to
the SUBJECT TELEPHONE and the LLAKATURA Cell Phone, sworn to by
FBI Task Force Officer Joseph Chimienti on July 16, 2013
(hereinafter, the "July 16, 2013 Location Data Affidavit"), the
start time of this call was mistakenly set forth as approximately
5:50 p.m..  The correct start time of the call is approximately
9:46 p.m..

which call was consensually recorded and confirmed by telephone records. A review of the recording reveals that, during this call, LLAKATURA asked John Doe #1 what happened. John Doe #1 told LLAKATURA he did not know what to do and that "they" showed up with weapons. LLAKATURA asked John Doe #1 where he was and John Doe #1 indicated he was in New Jersey. LLAKATURA advised John Doe #1 to stay in New Jersey and not to come to New York until tomorrow. LLAKATURA further advised John Doe #1 that he would be in Astoria tomorrow and would see what to do then.

18. Telephone records reveal that the SUBJECT TELEPHONE was used to call the LLAKATURA Cell Phone at approximately 1:42 p.m., 2:15 p.m., and 5:59 p.m. on July 8, 2013.

19. At approximately 9:49 p.m. on July 8, 2013, John Doe #1 received a text message on his mobile phone from LLAKATURA, using the LLAKATURA Cell Phone, asking how far John Doe #1 was from LLAKATURA's house. In response, John Doe #1 sent a text message to the LLAKATURA Cell Phone at approximately 9:52 p.m., indicating he was quite far from LLAKATURA's house. At approximately 9:53 p.m., John Doe #1 received a text message reply sent from the LLAKATURA Cell Phone, stating, in sum and substance, "forget it then." The content of each of these text messages has been reviewed by law enforcement agents and the time

of the messages, as well as the sending and receiving telephone numbers has been confirmed by telephone records.

20.   At approximately 1:08 a.m. on July 9, 2013, John Doe #1 received a text message on his mobile telephone from LLAKATURA, using the LLAKATURA Cell Phone, which text message was viewed by law enforcement agents and which telephone records confirm was sent from the LLAKATURA Cell Phone. The text message advised John Doe #1 to tell the manager of the Astoria Restaurant to be careful tomorrow and not to be by himself. Based on my participation in the investigation, and my training and experience, I believe this text message was meant to convey to John Doe #1 that DERVISHAJ and his associates intended to physically harm the manager of the Astoria Restaurant.

21.   On or about July 9, 2013, at approximately 10:19 a.m., John Doe #1 received a text message on his mobile telephone from LLAKATURA, using the LLAKATURA Cell Phone, asking John Doe #1 to meet him in Staten Island, New York. This text message has been viewed by law enforcement agents and telephone records confirm the time and sender of the text message. Thereafter, telephone records indicate that John Doe #1 spoke with LLAKATURA on the LLAKATURA Cell Phone. According to John Doe #1, during their conversation, LLAKATURA provided John Doe #1 with an address in Staten Island at which John Doe #1 could meet LLAKATURA and, further, that "they" had another "crew" following

John Doe #1 around and that they were "bad people."  Based on my
participation in the investigation, and my training and
experience, I believe LLAKATURA used the term "crew" to refer to
REDINEL DERVISHAJ and others working with him  and, further, was
attempting to instill fear in John Doe #1 by (1) indicating that
DERVISHAJ had additional associates following John Doe #1; and
(2) referring to DERVISHAJ and his associates as "bad people,"
which I believe was meant to convey that they were capable of
violence.

     22.    On or about the afternoon of July 9, 2013, John
Doe #1 met with LLAKATURA in Staten Island, New York, which
meeting was physically surveilled by law enforcement agents.[7]
John Doe #1 advised that the following transpired at the meeting,
in substance and in part:

     a.    LLAKATURA advised John Doe #1 that he was in
a bad situation and that the individuals extorting John Doe #1
were bad people who could not be fought because they would hurt
John Doe #1.

     b.    LLAKATURA further advised that, on or about
July 8, 2013, DERVISHAJ came to LLAKATURA's residence with two
friends, one of whom was an individual LLAKATURA knew as

---

[7]    John Doe #1 was equipped with a recording device during
this meeting, but the recording device malfunctioned and, as a
result, the meeting was not recorded.

17

"Altin,"[8] to discuss the amount of money they wanted from John Doe #1. LLAKATURA stated that DERVISHAJ wanted three months' payment from John Doe #1, for the three months the Astoria Restaurant had been open, totaling $12,000, by July 11, 2013. LLAKATURA told John Doe #1 that if John Doe #1 did not pay, John Doe #1 would be physically harmed. LLAKATURA further stated that the individuals extorting John Doe #1 had intended to wound John Doe #1 by shooting him on the evening of July 6, 2013.

      c.    John Doe #1 told LLAKATURA that he could not come up with $12,000 by July 11, 2013, and would only be able to pay $4,000 by that date. LLAKATURA stated that he would speak with "them" and get back to John Doe #1.

      23.    At approximately 7:48 p.m. on July 9, 2013, LLAKATURA sent a text message from the LLAKATURA Cell Phone to John Doe #1 stating "U have no problem do ur things," which text message was reviewed by law enforcement agents and which telephone records confirm was sent from the LLAKATURA Cell Phone. Based on my participation in the investigation, and my training and experience, I believe this text message was meant to convey to John Doe #1 that LLAKATURA had spoken with DERVISHAJ regarding John Doe #1's ability to make a payment (as LLAKATURA indicated he would at the conclusion of his July 9, 2013 meeting with John

---

[8]    In the July 16, 2013 Location Data Affidavit, the name of this individual was mistakenly set forth as "Ardit."

Doe #1) and that John Doe #1 and/or his employees would not be physically harmed that evening.

24. Telephone records indicate that, at approximately 10:41 p.m. on July 9, 2013, John Doe #1 received a telephone call on his mobile phone from the LLAKATURA Cell Phone. According to John Doe #1, during this phone call, LLAKATURA indicated that he was a few blocks away from the Astoria Restaurant and was going to pass by, which LLAKATURA thereafter did. Video surveillance footage in and around the Astoria Restaurant shows LLAKATURA arriving at the Astoria Restaurant at approximately 10:44 p.m. and thereafter speaking with John Doe #1 outside the Astoria Restaurant. John Doe #1 related that the following transpired during his meeting with LLAKATURA, in substance and in part:

a. LLAKATURA related that two Albanian men had come to see LLAKATURA and told LLAKATURA that they had been sent by DERVISHAJ.

b. According to LLAKATURA, one of the Albanian men then called DERVISHAJ from his mobile telephone and handed the phone to LLAKATURA. LLAKATURA advised that DERVISHAJ told LLAKATURA that John Doe #1 must pay DERVISHAJ $6,000 by July 11, 2013 and another $6,000 by August 15, 2013, otherwise DERVISHAJ would break John Doe #1's legs. LLAKATURA offered to loan John

Doe #1 $2,000 towards the $6,000 payment to DERVISHAJ due on July 11, 2013.

25.      Telephone records reveal that (1) the SUBJECT TELEPHONE was used to call the LLAKATURA Cell Phone at approximately 3:42 p.m., 3:53 p.m., 9:06 p.m., and 9:09 p.m. on July 9, 2013; and (2) the LLAKATURA Cell Phone was used to call the SUBJECT TELEPHONE at approximately 6:50 p.m., 8:32 p.m., 8:59 p.m., 9:00 p.m., and 11:39 p.m. on July 9, 2013. Based on the timing of these calls, my participation in the investigation, and my training and experience, I believe that (1) during the calls that took place before LLAKATURA's 10:44 p.m. meeting with John Doe #1, DERVISHAJ and LLAKATURA probably discussed the terms of John Doe #1's required payments to DERVISHAJ; and/or (2) during the 11:39 p.m. call following LLAKATURA's meeting with John Doe #1, LLAKATURA probably informed DERVISHAJ of what transpired during LLAKATURA's meeting with John Doe #1.

26.      On or about July 10, 2013 at approximately 6:08 p.m.,[9] John Doe #1 called LLAKATURA on the LLAKATURA Cell Phone, which call was consensually recorded and confirmed by telephone records. A review of the recording reveals that, during this phone call, LLAKATURA asked John Doe #1 whether John Doe #1 would

---

[9]      In the July 16, 2013 Location Data Affidavit, the start time of this call was mistakenly set forth as approximately 2:14 p.m.. The correct start time of the call is approximately 6:08 p.m..

make the cash payment to DERVISHAJ himself or whether LLAKATURA
should do so instead.  John Doe #1 stated that he wanted to meet
DERVISHAJ face-to-face.  LLAKATURA stated that he also wanted to
be present at the meeting with DERVISHAJ and advised John Doe #1
to meet LLAKATURA the next day in the afternoon.

27.    At approximately 7:11 p.m.[10] on July 10, 2013,
John Doe #1 called the LLAKATURA Cell Phone and spoke with
LLAKATURA, which call was consensually recorded and confirmed by
telephone records.  A review of the recording reveals that,
during the phone call, LLAKATURA and John Doe #1 discussed
whether to meet with DERVISHAJ later that night or the next day.
LLAKATURA told John Doe #1 that he would provide him with a
$2,000 loan when they met, but that John Doe #1 would need to
provide the rest of the money ($4,000).  LLAKATURA and John Doe
#1 ultimately agreed to meet the next day, after LLAKATURA got
off from work, in Astoria, New York.

28.    Telephone records reveal that (1) the SUBJECT
TELEPHONE was used to call the LLAKATURA Cell Phone at
approximately 4:57 p.m., 5:02 p.m., 5:05 p.m., and 7:32 p.m. on
July 10, 2013; and (2) the LLAKATURA Cell Phone was used to call

---

[10]    In the July 16, 2013 Location Data Affidavit, the start
time of this call was mistakenly set forth as approximately 3:23
p.m.. The correct start time of the call is approximately 7:11
p.m..

the SUBJECT TELEPHONE at approximately 5:54 p.m. and 6:15 p.m.[11] on July 10, 2013.

29.     On or about July 11, 2013 at approximately 11:33 a.m.[12], John Doe #1 called the LLAKATURA Cell Phone and spoke with LLAKATURA, which call was consensually recorded and confirmed by telephone records.  A review of the recording reveals that, during the call, John Doe #1 expressed concern over his safety and asked LLAKATURA if he could meet with LLAKATURA. LLAKATURA told John Doe #1 that they could meet later in the day, five minutes before the meeting with DERVISHAJ, to go over any concerns John Doe #1 had.  LLAKATURA stated that he would make sure nothing happened to John Doe #1 during the meeting with DERVISHAJ.  LLAKATURA ultimately agreed to meet with John Doe #1 briefly in Staten Island, New York.

30.     On or about the afternoon of July 11, 2013, John Doe #1 met with LLAKATURA in Staten Island, New York, which meeting was consensually recorded.  John Doe #1 advised that the following transpired during the meeting, in substance and in part:

---

[11]     In the July 16, 2013 Location Data Affidavit, the end time of this call (6:20 p.m.) was inadvertently listed as the start time of the call.  The correct start time of the call is 6:15 p.m..

[12]     In the July 16, 2013 Location Data Affidavit, the start time of this call is mistakenly set forth as approximately 7:37 a.m.. The correct start time of the call is approximately 11:33 a.m..

a.      LLAKATURA told John Doe #1 that John Doe #1 could open up a club with DERVISHAJ.  LLAKATURA advised that the club would be in John Doe #1's name, but DERVISHAJ would be a partner in the club.  In the event this transpired, LLAKATURA told John Doe #1 that for every $2,000 John Doe #1 made from the club, John Doe #1 would have to give DERVISHAJ $1,000.

b.      LLAKATURA stated that he had spoken with DERVISHAJ and that, as long as John Doe #1 paid DERVISHAJ, John Doe #1 would be fine.

c.      LLAKATURA stated that DERVISHAJ would search John Doe #1 when they met with DERVISHAJ later that night and that DERVISHAJ expected another $6,000 payment by August 15, 2013.

d.      While discussing possible options with John Doe #1, LLAKATURA told John Doe #1 that if he went into witness protection, DERVISHAJ and his associates would hurt members of John Doe #1's family who reside in another state, and asked John Doe #1 what type of car John Doe #1's brother-in-law has.

31.      A review of the recording of John Doe #1's meeting with LLAKATURA on the afternoon of July 11, 2013 corroborates John Doe #1's account of what transpired.  In addition, the recording reveals that, during the meeting, LLAKATURA told John Doe #1 that DERVISHAJ would not call John Doe #1 because DERVISHAJ is worried that John Doe #1 might have the

23

police involved.  LLAKATURA further indicated that he told
DERVISHAJ to search John Doe #1 when they meet.

32.     On or about the evening of July 11, 2013, John
Doe #1 met with LLAKATURA in Astoria, New York, which meeting was
physically surveilled and partially consensually recorded.
According to the physical surveillance, John Doe #1 entered
LLAKATURA's vehicle at approximately 6:03 p.m..  John Doe #1
advised that the following transpired during the meeting, in
substance and in part:

a.     John Doe #1 entered LLAKATURA's vehicle, at
which point LLAKATURA handed John Doe #1 $2,000 in cash.
LLAKATURA subsequently received a telephone call on his mobile
phone from DERVISHAJ, during which John Doe #1 overheard
DERVISHAJ telling LLAKATURA where to meet him.  Following this
phone call, LLAKATURA told John Doe #1 to take everything out of
his pockets and leave these items in LLAKATURA's vehicle.
LLAKATURA and John Doe #1 then  proceeded to meet with DERVISHAJ
in Astoria, New York on an isolated street corner.[13]

b.     At the start of the meeting with DERVISHAJ,
DERVISHAJ searched both John Doe #1 and LLAKATURA.  DERVISHAJ

---

[13]     A review of the recording corroborates John Doe #1's
account of what transpired, as set forth in paragraph 32(a). The
recording captures DERVISHAJ's voice telling LLAKATURA where they
should meet.  In addition, telephone records indicate that the
LLAKATURA Cell Phone received an incoming call from the SUBJECT
TELEPHONE at approximately 6:07 p.m. on July 11, 2013.

24

then asked John Doe #1 what he had to say for himself.   LLAKATURA
told John Doe #1 to give DERVISHAJ the money, at which point
DERVISHAJ gestered to slow down and asked John Doe #1 to get into
DERVISHAJ's car – the Chevy Malibu – with DERVISHAJ.   LLAKATURA
remained outside the Chevy Malibu.

       c.   While inside the Chevy Malibu, DERVISHAJ told
John Doe #1 that he was lucky the other night and that John Doe
#1 and the manager of the Astoria Restaurant should thank
LLAKATURA.   John Doe #1 then handed DERVISHAJ $6,000 in cash,[14]
at which point DERVISHAJ inquired about the rest of the money.
John Doe #1 indicated that he was told he had until August 15,
2013 to come up with the rest of the money.

       d.   DERVISHAJ stated that, in the future, he
would give John Doe #1 his telephone number, which John Doe #1
could use to contact DERVISHAJ, in the event John Doe #1 needed
protection and, also, to make payments to DERVISHAJ.   John Doe #1
then left the meeting location with LLAKATURA.

       33.   On August 6, 2013, the Honorable Dora L.
Irizarry, United States District Judge for the Eastern District
of New York, authorized the interception of wire and electronic
communications over the SUBJECT TELEPHONE for a period of 30
days.   Since the commencement of interceptions over the SUBJECT

---

      [14]   The government provided John Doe #1 with $4,000 in cash
to provide to DERVISHAJ in advance of the July 11, 2013 meeting.

TELEPHONE on August 7, 2013, I have confirmed that the SUBJECT
TELEPHONE is used by DERVISHAJ to communicate with, inter alia,
LLAKATURA and NIKOLLA regarding criminal activity, including the
extortion and conspiracy to commit extortion. The intercepted
communications reveal that DERVISHAJ uses the SUBJECT TELEPHONE
to facilitate extortion activities involving John Doe #1 and
other victims. Some of the calls and text messages intercepted
over the SUBJECT TELEPHONE, all of which were in Albanian, are
summarized and described below. All quotations and summaries of
intercepted communications are based on line sheets and draft
translations and summaries, not final transcripts.

      34.    On or about August 12, 2013, at approximately
5:06 p.m., John Doe #1 called the LLAKATURA Cell Phone, which
call was consensually recorded. A review of the recording
reveals that, during the call, John Doe #1 informed LLAKATURA
that DERVISHAJ had not given John Doe #1 his phone number yet and
that he was worried that DERVISHAJ would come by unannounced
seeking payment and John Doe #1 would "have nothing." John Doe
#1 further asked LLAKATURA if he had seen DERVISHAJ around. In
response, LLAKATURA implied that he had not seen or spoken with
DERVISHAJ in a week, stating, in sum and substance, "It's been a
week since I have been to Astoria." With respect to DERVISHAJ
not having given John Doe #1 his number, LLAKATURA responded, in
sum and substance, "So what? Why do you give a fuck? So he

comes on the 16th, 17th, or the 20th, why do you give a fuck?"
LLAKATURA further stated, in sum and substance, "I don't want to
call him man.  Not only that, but they change their numbers the
same way they change their whores.  [UI]  If I go today to
Astoria and happen to see anyone, okay.  If I don't see [UI]
whenever.  You should not give a fuck.  That's right.  If he
wants to.  If he doesn't want to, fuck him.  Okay?"

      35.    A few minutes thereafter on the same day, at
approximately 5:12 p.m., DERVISHAJ received an incoming call on
the SUBJECT TELEPHONE (Session 471)$^{15}$ from  (917) 500-5727,
which, a mobile telephone subscribed to by "TAPAS SINY" at 661
Bay St., Staten Island, New York 10304-3828.  An establishment
called Tapas Restaurant and Bar is located at 661 Bay Street in
Staten Island and is owned by a corporation of which LLAKATURA's
father is a principal.  During the phone call, LLAKATURA appears
to speak in code, referring to John Doe #1 as a woman who is
asking whether she needs to give DERVISHAJ a Valentine's Day gift
the day after Valentine's day (i.e., the 15th), to inform
DERVISHAJ of the phone call he received from John Doe #1 just
moments earlier:

        BL:  I am taking care of your problems now too, fucking
             shit!

---

[15]    All dates and times set forth herein of communications
intercepted pursuant to the Court-authorized wiretap of the
SUBJECT TELEPHONE are approximate and based on the monitoring
equipment at the time the calls and texts were intercepted.

RD:   Why brother?

BL:   You want to fuck her and you—

RD:   Hey uh, I am not alone here.

BL:   Oh, I am sorry.  And you don't give your phone number.

RD:   Why?  Were there problems?

BL:   No, there have not been any.  But said, "Will I give a gift for Valentine's Day or not?  Or what?

RD:   I will give it this time when we meet.  I will give the number too.

BL:   Hey don't. . . Valentine's is on February 14th. [She] said she will not celebrate it on the 15th because she said the problem is that… I am sorry, who is listening there?  Maybe will not give it at all.

RD:   [Laughs]

BL:   [Laughs]

RD:   Oh, he wants to on the 14th?

BL:   Oh I don't know.  Now you . . . She wants you and now you're like this and that.

RD:   Huh.

BL:   I have my own problems with my own stuff.  Now I have to take care of problems.

RD:   [Laughs]

BL:   You're giving me a headache.  Even the little gray hair I have left will fall off.

RD:   Yes, yes.

BL:   Hey pretend you pass by, not today cause it will look bad, [UI] tomorrow.

RD:   Tomorrow?

BL:  And leave a number so that whenever she feels like making love to you…

RD:  Yes.

BL:  Do you understand?

36.    According to John Doe #1, on or about August 14, 2013, at approximately 3:45 p.m., John Doe #1 received a telephone call from DERVISHAJ, calling from phone number (646) 894-7578.  According to John Doe #1, DERVISHAJ provided him with (646) 894-7578 as his phone number (hereinafter, the "646 DERVISHAJ Number").

37.    On August 16, 2013, at approximately 4:18 p.m., John Doe #1 called the 646 DERVISHAJ Number, which call was consensually recorded.  A review of the recording reveals that, during the call, John Doe #1 asked DERVISHAJ if he would come to the Queens Pizzeria to receive an extortion payment from John Doe #1.  DERVISHAJ stated he was in New Jersey, but would call John Doe #1 when he was back in New York.  At approximately 7:04 p.m., John Doe #1 called the 646 DERVISHAJ Number again, which call was consensually recorded.  A review of the consensual recording reveals that, during the call, DERVISHAJ indicated he had returned from New Jersey and would go meet John Doe #1 at the Queens Pizzeria.  Thereafter, an FBI surveillance team followed DERVISHAJ as he drove from his residence in Queens to the Queens Pizzeria.  According to the surveillance team, DERVISHAJ drove

29

past the Queens Pizzeria, but did not exit his vehicle and enter the pizzeria.

38.     At 8:14 p.m. the same evening, DERVISHAJ placed an outgoing call on the SUBJECT TELEPHONE (Session 563) to the LLAKATURA Cell Phone.  During the call, DERVISHAJ appears to advise LLAKATURA that he has turned off his "other phone" because his meeting with John Doe #1 may be a "set-up."

RD:   I closed the other phone.

BL:   Who?

RD:   Me, me.

BL:   Why?

RD:   Eh, it's set up.  Okay?  We'll meet.  Bye.

39.     Based on my training, experience and participation in the investigation, I believe (1) the "other phone" is the 646 DERVISHAJ Number and (2) the term "set-up" is an indication that DERVISHAJ suspected his vehicle was being followed by law enforcement agents.

40.     At 9:02 p.m. that evening, DERVISHAJ received an incoming call on the SUBJECT TELEPHONE (Session 566) from the LLAKATURA Cell Phone.  During the call, LLAKATURA asked DERVISHAJ where he was.  DERVISHAJ stated that he had just stopped at "the plaza" on 29th Street and 30th Avenue for coffee with his girlfriend.  LLAKATURA stated that he was on his way and asked if he could meet DERVISHAJ in five minutes.  DERVISHAJ agreed.

41.     At approximately 9:07 p.m. that evening, John
Doe #1 called the 646 DERVISHAJ Number, which call was
consensually recorded and went to voicemail.  A review of the
consensual recording reveals that John Doe #1 left DERVISHAJ a
message asking DERVISHAJ whether he was coming and indicating
that DERVISHAJ should call him, as he would be leaving the Queens
Pizzeria.  At 9:15 p.m., DERVISHAJ received an incoming call on
the SUBJECT TELEPHONE (Session 567) from the LLAKATURA Cell
Phone.  During the call, LLAKATURA and DERVISHAJ advised each
other where to meet.

42.     At 9:17 p.m., DERVISHAJ placed an outgoing call
on the SUBJECT TELEPHONE (Session 568) to the LLAKATURA Cell
Phone.  During the call, DERVISHAJ apologized for making
LLAKATURA wait and the two again arranged to meet without others
present:

> RD:  You will wait five minutes.  Huh?  I am sorry to
>      make you wait.
>
> BL:  Oh, okay.
>
> RD:  My girlfriend went somewhere and I have no one who
>      can stay at the table.
>
> BL:  Uh-huh.
>
> RD:  I will be there.  Sorry to make you wait, huh?
>
> BL:  Oh yeah, oh.  Are you alone at the table?
>
> RD:  Yeah, now I am alone at the table.  She went to
>      get her friend.  As soon as we sat down, she
>      called her.

BL:  So she went to get her there?

RD:  Eh.

BL:  You meet me here in the corner.  What's the
     problem?

RD:  Which corner?

BL:  Here, I am close by.

RD:  Where are you?  I don't see you.

BL:  At the end of the street.

RD:  Where at the end of the street?

BL:  [UI] plaza, yeah, yeah behind.  Turn around.  Eh,
     yeah.

RD:  Oh there.

43.    Given what transpired during this call, along
with my training, experience and participation in the
investigation, I believe that DERVISHAJ and LLAKATURA met briefly
at the end of the call and discussed John Doe #1 and DERVISHAJ's
suspicion that he was being followed by law enforcement.

44.    Several minutes later, at approximately 9:25
p.m., John Doe #1 called the LLAKATURA Cell Phone, which call was
consensually recorded and went to voicemail.  A review of the
consensual recording reveals that John Doe #1 left LLAKATURA a
message asking LLAKATURA to call him.  At approximately 9:30
p.m., John Doe #1 received a call from the LLAKATURA Cell Phone.
According to John Doe #1, during the call, John Doe #1 told
LLAKATURA, in sum and substance, that DERVISHAJ was supposed to

pick up the extortion payment, but now was not answering his
phone and John Doe #1 did not know what to do.   LLAKATURA asked
John Doe #1 where he was and   whether he would come to Astoria.
John Doe #1 indicated he would come to Astoria after work.
LLAKATURA asked John Doe #1 to call him when he was in Astoria.

     45.   Approximately half an hour later, at 9:59 p.m.,
DERVISHAJ received an incoming call on the SUBJECT TELEPHONE
(Session 569) from the LLAKATURA Cell Phone.   During the call,
LLAKATURA appears to inform DERVISHAJ, in coded language, about
his call with John Doe #1:

> BL:   That bitch called me.
>
> RD:   Uh-huh.
>
> BL:   You know for what.
>
> RD:   Yes.
>
> BL:   Said why, meaning "why she doesn't want to go out
> with me?"  Do you understand?   For that–
>
> RD:   Uh-huh.
>
> BL:   I said if there was anything, I will meet you
> instead of him.
>
> RD:   Uh-huh.   What did he say?
>
> BL:   Yeah.
>
> RD:   He said okay?
>
> BL:   Yeah.
>
> RD:   Okay, okay.

BL:  Okay.  If there is anything then.  Just look, you know how...

RD:  Yeah, yeah.

BL:  Okay?

RD:  I'll check things myself.

BL:  Okay.  Look, if she has information that she is being followed, good bye-

RD:  Uh-huh.

BL:  Do it like I told you and tell me right away.

RD:  Okay.

BL:  Okay?  Slowly.

Based on my training, experience and participation in the investigation, I believe LLAKATURA's use of the term "that bitch" is a reference to John Doe #1.

46.    Half an hour later, at approximately 10:28 p.m., John Doe #1 received three text messages sent from the LLAKATURA Cell Phone indicating that John Doe #1 should meet LLAKATURA at a street corner in Astoria, New York.  At approximately 10:42 p.m., John Doe #1 called the LLAKATURA Cell Phone, which call was consensually recorded.  A review of the recording reveals that, during the call, John Doe #1 expressed frustration that DERVISHAJ did not come to the Queens Pizzeria and asked LLAKATURA what was going on:

JD#1:  I am still at the pizzeria.

BL:  Uh-huh.

34

JD#1:   [UI]   What, what, what is going on with [UI]?

BL:     Huh?

JD#1:   What is going to happen with him?  I don't
        get what's going on.

BL:     Come here.  Come and meet with me.  I told you.

JD#1:   I am throwing up and stuff, fucking shit.

BL:     Who?

JD#1:   They're giving me a heart attack *man*.  I
        don't know what is going to happen.

BL:     Come, come.

JD#1:   Huh?

BL:     I am saying come meet me here.

JD#1:   What's going to happen?  I don't know what's
        going to happen with this.

BL:     I am telling you to come and meet with me.  Do
        you hear me?  Don't talk on the phone.

JD#1:   Uh-huh.

BL:     *Okay?*[19]

JD#1:   [UI]

BL:     *Alright, bye.*

47.     At approximately 10:51 p.m., John Doe #1

received two text messages from the LLAKATURA Cell Phone, stating

"hello" and "just come."  John Doe #1 called the LLAKATURA Cell

Phone at approximately 10:51 p.m., which call was consensually

recorded and went to voicemail.  A review of the recording

---

[19]     Words in italics were said in English.

reveals that John Doe #1 left a message indicating he was not going to meet LLAKATURA that evening as he was not feeling well, but they could meet "some other day."  At approximately 11:14 p.m., John Doe #1 received a phone call from the LLAKATURA Cell Phone, which he did not answer.  At approximately 11:40 p.m., John Doe #1 called the LLAKATURA Cell Phone, which call was consensually recorded.  A review of the recording reveals that, during the call, LLAKATURA made it appear as though he had not been in contact with DERVISHAJ that evening and was not involved in DERVISHAJ's extortion activities.  He further feigned concern for John Doe #1:

> BL:    What has happened *man*?
>
> JD#1:  What?  Nothing has happened.  Do I know what happens at 12 midnight?
>
> BL:    Who?
>
> JD#1:  What?  For what should I come there at 12 midnight?  [overlap] He was supposed to, he was supposed to come and meet me but did not come.  He doesn't pick up the phone or anything.
>
> BL:    I don't know *man* what's up.  I thought that there was something going on with you.
>
> JD#1:  There is nothing going on with me.  I am okay.  But because of that—
>
> BL:    I told you, you should not give a fuck.  When it happens . . . Why do you worry?  You're a moron.  I thought that maybe something happened to you and that's why I told you to come.
>
> JD#1:  *No man*, nothing has happened to me.  But I waited—

36

BL:     Why do you give a fuck?

JD#1:   -- I waited for the motherfucker and that. . .
        I've been carrying all that money with me for
        that motherfucker.

BL:     Go home man, fuck it.  Go relax at home.  You
        should not give a fuck.  And that's it.

JD#1:   Uh-huh.

BL:     I thought you called because something happened
        *man.*

JD#1:   *No man*, nothing has happened.  Because of that,
        because he did not come and . . . my leg is a
        mess *fucking* I had surgery on it three days ago.
        And that motherfucker "I will come, I will come"
        and I don't understand what's happening.

BL:     And you give a fuck! You're a moron.  You talked
        about it once and now you should not give a
        shit.  If he wants, if not, all of them can fuck
        themselves.

JD#1:   Uh-huh.

BL:     I thought . . . Fucking shit.  I thought there
        was something wrong and that's why I said come.
        That's why.

JD#1:   No, it's nothing like that, no.

48.     On August 17, 2013, at 12:20 p.m., DERVISHAJ

placed an outgoing call on the SUBJECT TELEPHONE (Session 570) to

the LLAKATURA Cell Phone.  During the call, LLAKATURA appears to

update DERVISHAJ regarding his last phone conversation the night

before with John Doe #1:

RD:     Anything new?

BL:     Nothing really, the same.  He told me, "I'm
        waiting, waiting.  What's next?  Yes, no, or
        what-"

RD:   Uh-huh.

BL:   "if he wants or what he does not want, or what,"
      you know?  That's how we left it.

RD:   Uh-huh.  Are you going to be long?

BL:   Not sure.  Why?

RD:   If we could meet.

BL:   Okay, when I come back.

49.      Thereafter, on August 17, 2013, at

approximately 4:45 p.m. and 5:13 p.m., John Doe #1 received two

calls from the 646 DERVISHAJ Number, which John Doe #1 did not

answer.  At 6:04 p.m., DERVISHAJ received an incoming call on the

SUBJECT TELEPHONE (Session 591) from the LLAKATURA Cell Phone.

During the call, DERVISHAJ appears to complain to LLAKATURA that

John Doe #1 is not answering his phone calls:

RD:   I called him, I called him twice.  He doesn't pick
      up the phone.

BL:   Uh-huh, okay.

RD:   I don't like it at all.

BL:   Huh?

RD:   I don't like it that he is not picking up the
      phone.

BL:   [UI] the friend [UI].

RD:   Your friend?

BL:   Yeah.

RD:   Huh.

BL:   Because it's the last [UI].

38

RD:    But why brother?

BL:    For no reason.  He owes you.  He is afraid because he owes money and that's it.

RD:    Okay then.

BL:    Okay?

RD:    Okay then, we'll talk.

BL:    Bye.

RD:    Call me for everything.

Thereafter, John Doe #1 received four more incoming calls from the 646 DERVISHAJ Number at the following approximate times on August 17, 2013: 7:59 p.m., 8:03 p.m., 9:15 p.m., and 9:28 p.m. John Doe #1 did not answer any of these calls.

50.    On August 18, 2013, at approximately 11:51 a.m., John Doe #1 received an incoming call from the 646 DERVISHAJ Number, which he did not answer.  At approximately 12:27 p.m., John Doe #1 called the 646 DERVISHAJ Number, which call was consensually recorded.  A review of the recording reveals that, during the call, DERVISHAJ complained that John Doe #1's phone did not work:

RD:    Your phone doesn't work?

JD#1:  But I have also not been feeling well.  I have been throwing up and stuff.

RD:    *Okay.*

JD#1:  What are you doing?

RD:    Not much.

39

JD#1: I waited for you on Friday *man*.

RD:   Huh?

JD#1: I am saying that I waited for you on Friday.   You
      did not come.

RD:   *Yeah* I did not come because I was busy.

JD#1: Uh-huh.   When will you come now?

RD:   Huh?

JD#1: I am saying, when will you come?

RD:   When will I come now?   God willing when I have
      time I will come and meet you, *okay*?

JD#1: *Alright*.   I come back tomorrow, if so…

RD:   Okay, good.   God willing.

JD#1: Good night then.   Ciao.

Thereafter, at 12:46 p.m. on August 18, 2013, DERVISHAJ placed an
outgoing call on the SUBJECT TELEPHONE (Session 600) to the
LLAKATURA Cell Phone.   During the brief call, DERVISHAJ and
LLAKATURA indicated that they would speak on another phone.
Based on their training, experience and participation in the
investigation, I believe DERVISHAJ subsequently spoke to
LLAKATURA using an unmonitored telephone to update LLAKATURA on
his phone call with John Doe #1.

        51.    On or about August 20, 2013 at approximately
9:40 p.m., John Doe #1 met with LLAKATURA in Astoria, New York to
make an extortion payment, which meeting was consensually
recorded.   A review of the recording reveals that at the

                              40

beginning of the meeting, LLAKATURA asked John Doe #1 whether he
had his phone with him.  John Doe #1 stated that he left his
phone in his car.  LLAKATURA then stated "come here, open your
arms," at which point, according to John Doe #1, LLAKATURA patted
John Doe #1 down.  The recording further reveals that, during the
meeting, LLAKATURA told John Doe #1, in sum, substance and in
part, that (1) DERVISHAJ told LLAKATURA that the night DERVISHAJ
was supposed to meet John Doe #1 at the pizzeria, DERVISHAJ was
followed by "two FBI cars;" (2) DERVISHAJ suspected he was
followed because of John Doe #1; and (3)  LLAKATURA explained to
DERVISHAJ that John Doe #1 would not go to law enforcement
because John Doe #1 has family in the United States and Albania.
LLAKATURA further warned John Doe #1 that "they are
motherfuckers" and that "if something happens to him [DERVISHAJ],
fuck it, they are animals."  LLAKATURA also reported that
DERVISHAJ said "he will not go to jail" and that John Doe #1
should know that DERVISHAJ will not "just let it go" if something
happens to DERVISHAJ.  After John Doe #1 denied any involvement
with law enforcement, LLAKATURA offered to accept John Doe #1's
extortion payments going forward if John Doe #1 was afraid to pay
DERVISHAJ himself.  During the meeting, LLAKATURA accepted a
$6,000 payment from John Doe #1[20] and told John Doe #1 that he
would not have any problems with DERVISHAJ since he was making

---

[20]    The government provided John Doe #1 with $6,000 in cash
to provide to LLAKATURA in advance of the August 20, 2013
meeting.

payments.  Throughout the conversation, LLAKATURA expressed concern about getting involved with DERVISHAJ, indicating that he could lose his job or end up in jail by receiving phone calls from DERVISHAJ.

52.   Based on my training experience and participation in the investigation, I believe LLAKATURA used this conversation to convey threats of violence to John Doe #1 and his family if John Doe #1 reported the extortion to law enforcement, while at the same time attempting to appear as though he was only involved in the extortion to help John Doe #1, at great personal risk to himself.

53.   As noted above, communications intercepted over the SUBJECT TELEPHONE also reveal that DERVISHAJ, NIKOLLA and LLAKATURA are involved in extorting victims other than John Doe #1 and use the SUBJECT TELEPHONE to facilitate their extortion activities.  For example, on August 7, 2013, at 2:18 p.m., DERVISHAJ placed an outgoing call on the SUBJECT TELEPHONE (Session 196) to  (516) 423-1788, a mobile telephone subscribed to by DENIS NIKOLLA - the individual that John Doe #1 identified as the driver of the Dodge Charger who pointed a gun at John Doe #1 on July 6, 2013.  During the call, NIKOLLA informed DERVISHAJ of his attempt to collect a payment of thousands of dollars from an unknown individual and his use of physical violence in attempting to collect payment.

54.    On August 15, 2013, at 8:42 p.m., DERVISHAJ

received an incoming call on the SUBJECT TELEPHONE (Session 523)

from (516) 423-1788. During the call, NIKOLLA informed DERVISHAJ

that he had spoken with an extortion victim:

DN:   Andrea's partner called me on the phone.

RD:   Come on, don't say anything on the phone.

DN:   Okay.

RD:   What did he say?

DN:   He goes [UI].  They told me, I'm working something
      out, he said.  He also goes, please give me some
      time [UI] and I'll have something for you guys.

Based on my training, experience and participation in the

investigation, I believe "Andrea's partner" is an extortion

victim, who called NIKOLLA to ask for more time to come up with

an extortion payment.

55.    On August 31, 2013, at 5:56 p.m., DERVISHAJ

placed an outgoing call on the SUBJECT TELEPHONE to (516) 423-

1788. During the call, NIKOLLA told DERVISHAJ that after

DERVISHAJ left, NIKOLLA had a fight with "Jimmy."  NIKOLLA

further stated that he asked Jimmy to tell "Kosta" that he wants

his money by tomorrow.  Based on my training, experience and

participation in the investigation, I believe "Kosta" is an

extortion victim.

56.    There is therefore probable cause to believe

that the REQUESTED INFORMATION will lead to evidence regarding

43

the activities described above.  The REQUESTED INFORMATION is also necessary to assist law enforcement agents in conducting surveillance and to determine where members of the conspiracy meet and conduct their extortion activities.

### PRIOR APPLICATIONS REGARDING THE SUBJECT TELEPHONE

57.    On July 12, 2013, the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge, signed an order authorizing a pen register and trap and trace device on the SUBJECT TELEPHONE for a period of 60 days.  (13 MISC 532).  On July 16, 2013, the Honorable Cheryl M. Pollak, United States Magistrate Judge, signed an order authorizing the release of historical cell-site information for, inter alia, the SUBJECT TELEPHONE for the period from May 1, 2013 to July 16, 2013. (13 MISC 539).  On July 16, 2013, the Honorable Cheryl M. Pollak, United States Magistrate Judge, signed an Order authorizing the disclosure of geographic location information for, inter alia, the SUBJECT TELEPHONE for a period of 30 days. (13 MISC 540).  On August 6, 2013, the Honorable Dora L. Irizarry, United States District Judge in the Eastern District of New York, authorized the interception of wire and electronic communications and the disclosure of geographic location information over the SUBJECT TELEPHONE for a period of thirty days. (13 MISC 0618 (DLI)).

## AUTHORIZATION REQUEST

58.     WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents to obtain the REQUESTED INFORMATION for a period of 30 days.  This Court has jurisdiction to issue the requested warrant and Order because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  See 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

59.     IT IS FURTHER REQUESTED that the Court direct the Service Provider to assist law enforcement by providing all information, facilities and technical assistance needed to ascertain the REQUESTED INFORMATION, and further direct the service provider to initiate a signal to determine the location of the SUBJECT TELEPHONE on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement officer serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of the SUBJECT TELEPHONE, for a period of 30 days.  Reasonable expenses incurred

pursuant to this activity will be processed for payment by the FBI.

60.     IT IS FURTHER REQUESTED that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONE outside of daytime hours.

61.     IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed or any extension thereof. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of the SUBJECT TELEPHONE would seriously jeopardize the ongoing investigation, as such disclosure would give the targets of the investigation an opportunity to destroy evidence, harm or threaten victims or other witnesses, change patterns of behavior, notify confederates, and flee from and evade prosecution. Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

46

62.     IT IS FURTHER REQUESTED that this Court issue
an order sealing, until further order of the Court, all papers
submitted in support of this application, including the
application and search warrant.  I believe that sealing these
documents is necessary because the items and information to be
seized are relevant to an ongoing investigation into the criminal
organization, and not all of the targets of this investigation
will be searched at this time.  Based upon my training and
experience, I have learned that criminals actively search for
criminal affidavits and search warrants via the internet, and
disseminate them to other criminals as they deem appropriate,
e.g., by posting them publicly through online forums.  Therefore,
premature disclosure of the contents of this affidavit and
related documents will seriously jeopardize the investigation,
including by giving targets an opportunity to flee or continue
flight from prosecution, destroy or tamper with evidence, change
patterns of behavior, and notify confederates.

63.     IT IS FURTHER REQUESTED that, pursuant to 18
U.S.C. § 2705 (b) and for the reasons stated above, it is further
requested that the Court issue an Order commanding T-Mobile not
to notify any person (including the subscribers or customers of

47

the account listed in the attached warrant) of the existence of

the attached warrant until further order of the Court.

Dated:      Brooklyn, New York
            September 10, 2013


                              _____
                              Sean Olsewski
                              Special Agent
                              Federal Bureau of Investigation


Sworn to before me September 10, 2013


   s/Steven M. Gold

_____
THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK


48

## ATTACHMENT A

### Property To Be Searched

1.     The cellular telephone assigned call number (571) 337-7018 (the "SUBJECT TELEPHONE"), whose wireless service provider is T-Mobile, a company headquartered at 12920 SE 38th Street, Bellevue, WA 98006.

2.     Information about the location of the SUBJECT TELEPHONE that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone if it is subsequently assigned a different call number, beginning at any time within ten days of the date of this Warrant and for a period not to exceed 30 days.

**ATTACHMENT B**

Particular Things to be Seized

All information about the location of the SUBJECT
TELEPHONE described in Attachment A for a period of thirty days,
during all times of day and night. "Information about the
location of the SUBJECT TELEPHONE" includes all available E-911
Phase II data, GPS data, latitude-longitude data, and other
precise location information, as well as all data about which
"cell towers" (i.e., antenna towers covering specific geographic
areas) and "sectors" (i.e., faces of the towers) received a radio
signal from the cellular telephone described in Attachment A.

To the extent that the information described in the
previous paragraph (hereinafter, "Location Information") is
within the possession, custody, or control of T-Mobile, T-Mobile
is required to disclose the Location Information to the
government. In addition, T-Mobile must furnish the government
all information, facilities, and technical assistance necessary
to accomplish the collection of the Location Information
unobtrusively and with a minimum of interference with T-Mobile's
services, including by initiating a signal to determine the
location of the SUBJECT TELEPHONE on T-Mobile's network or with
such other reference points as may be reasonably available, and
at such intervals and times directed by the government. The
government shall compensate T-Mobile for reasonable expenses
incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes
tangible property, wire or electronic communications (as defined
in 18 U.S.C. § 2510), or stored wire or electronic information,
there is reasonable necessity for the seizure. See 18 U.S.C.
§ 3103a(b)(2).